RECEIVED-CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

2004 NOV 24 ₽ 2: 25

UNITED STATES OF AMERICA,

v

ANGELA KHOROZIAN,

        Defendant

: DOCKET NO.00-393 (WHW)
: CIVIL ACTION
:
: CV. 04-4879

---

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S
MOTION TO VACATE, SET ASIDE, OR CORRECT
SENTENCE PURSUANT TO 28 U.S.C. §2255**

---

Law Offices of Edward J. Bilinkas
415 Rt. 10 East
Randolph, New Jersey 07869
Attorneys for Defendant, Angela Khorozian

## TABLE OF AUTHORITIES

**FEDERAL CASES**

Aldrich v. Wainwright, 777 F.2d 630 (11th Cir. 1985) . . . . . . 9

Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000) . . 36

Armienti v. United States, 234 F.3d 820(2d Cir. 2000) . . . . . 20

Berger v. United States, 295 U.S. 78, 55 S. Ct. 629 (1935) . . . 5

Blakely v. Washington,-U.S. -, 124 S.Ct. 2531 (2004) . . . . 35,36

Bousley v United States, 523 U.S. 614 (1998) . . . . . . . . . 3

Boyle v. Johnson, 93 F.3d 180 (5th Cir. 1996) . . . . . . . . . 35

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963) . 23, 26, 28

Brown v. Artuz, 124 F. 3d 73 cert.  denied 211 U.S. 128,
118 S. Ct.1756 (1973). . . . . . . . . . . . . . . . . . . . . 5

Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328 (1990) . . . . . 38

Darden v. Wainwright, 477 U.S. 168 (1986) . . . . . . . . . . . 29

Dowling v. United States, 493 U.S. 342, 110 S. Ct. 668 (1990) . 32

Ferguson v. State of Georgia, 365 U.S. 570, 81 S.Ct. 756 (1961) . 6

Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756 (1973) . . . . . 5

Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763(1972)   28, 29

Gomez v. Beto, 462 F.2d 596, 597 (5th Cir. 1972) . . . . . . . 23

Goodwin v. Johnson, 132 F.3d 162 (5th Cir. 1997) . . . . . . 31,33

Haber v. Wainwright, 756 F.2d 1520 (11th Cir. 1985) . . . . . . 25

Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173 (1978) . . . 16

House v. Balkcom, 725 F.2d 608 (11th Cir. 1984) . . . . . . . 8, 9

In re Winship, 397 U.S. 358, 90 S. Ct. 1068 (1970) . . . . . . 38

Ivan v. City of New York, 407 U.S. 205, 92 S.Ct. 1951 (1972)   .   38

Jones v. Barnes, 463 U.S. 778, 103 S. Ct. (1983)   . . . . . . . . 5

Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995) . . .   29, 30

Lindstadt v. Keane, 239 F.3d 191 (2nd Cir. 2001)   . . . . . . . . 8

Marshall v Hendricks, 307 F.3d 36, cert. den. 538 U.S. 911, 123
S.Ct. 1492 (2003) . . . . . . . . . . . . . . . . . . . . . .   28

Machibroda v. United States, 268 U.S. 487, 82 S. Ct. 510 (1962)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Massaro v. United States, 538 U.S. 500, 123 S.Ct. 1690 (2003) .   21

McCoy v. Newsome, 953 F.2d 1252, 1262 (11th Cir. 1992)   . . . . 8,9

McMann v. Richardson, 397 U.S. 759 (1970) . . . . . . . . . . . . 3

Mesareosh v. United States, 1,352 U.S. 1, 77 S. Ct. (1956)   . .   33

Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639 (1986)   . . . .   21

Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173 (1959)   . . . .   32

Pavel v. Hollins, 261 F.3d 210 (2nd Cir. 2001)   . . . . . . . 22,23

Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934 (1989) . . . . 36,37

Powell v. Alabama 287 U.S. 45,53 S. Ct. 55   . . . . . . . . . . 4

Ratliff v. United States, 999 F.2d 1023 (6th Cir. 1993) . . . .   14

Rega v. United States, 263 F.3d 18 (2d Cir. 2001), cert. denied,
534 U.S. 1096, 122 S.Ct. 847 (2002) . . . . . . . . . . . . . 5,6

Ring v. Arizona, 536 U.S. 610 (2002)   . . . . . . . . . . . .   37

Robinson v. Arvonio,   27 F.3d 877 (3rd Cir. 1994) . . . . . . .   34

Rock v. Arkansas, 483 U.S. 44,107 S. Ct. 2704 (1987)   . . . . . 6

Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257 (1990)   . . . . .   37

Scrivner v. Tansy, 68 F.3d 1234 (10th Cir.)cert. denied, 516

U.S. 1178 (1996)  . . . . . . . . . . . . . . . . . . . 33

Shiro v. Summerline, -U.S.-, 124 S.Ct. 2519 (2004)  . . . . . . 37

Smith v. Phelps, 455 U.S. 209, 210 (1982) . . . . . . . . . . 29

Solis v. United States, 252 F.3d 289 (3rd  Cir. 2001) . . . . . 20

States, 405 U.S. 150, 153-54 (1972) . . . . . . . . . . . . 26, 27

Strickland v. Washington, 466 U.S. 668(1984)  . . . . . . 3, 4,8,22

Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936 (1999)  . . . 29

Sullivan v Fairman, 819 F.2d 1382 (7th Cir 1987)  . . . . . . . 9

Teague v. Lane, 489 U.S. 288 (1989)   . . . . . . . . . . 34,36,37

Tyler v. Cain 533 U.S. 656 (2001) . . . . . . . . . . . . . . 36

United States v. Addonizio, 442 U.S. 178 (1979) . . . . . . . . 2

United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392 (1976) .  29, 34

United States v. Baca, 687 F.2d 1356 (10th Cir. 1982) . . . . . 33

United States v. Bagley, 473 U.S. 667, 676 (1985), 105 S. Ct.
3375  . . . . . . . . . . . . . . . . . . . . . . . 28, 29,30

United States  v. Baptista-Rodriguez, 17 F.3d 1354, 1366 (11th
Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Barrentine, 591 F.2d 1069, 1081  . . . . . . . 25

United States v. Christo, 614 F.2d 486, 492 (5th Cir. 1980) . . 40

United States v. Cronic, 466 U.S. 648, 653  . . . . . . 3, 4, 8, 21

United States v. Feyrer, 333 F.3d 110, 116 (2nd Cir. 2003)  . . 17

United States v. Frady, 456 U.S. 152 (1982) . . . . . . . . . . 2

United States v. Gambino, 864 F.2d 1064, 1070 (3d Cir. 1988),
cert. denied, 492 U.S. 906, 109 S.Ct. 3215 (1989) . . . . . . . 16

United States v. Garth, 188 F.3d 99 (3rd Cir. 1999) . . . . . . 3

iii

United States v. Goodwin, 457 U.S. 368, 102 S. Ct. 2485 (1982)   31

United States v. Gray, 878 F.2d 702 (3d Cir. 1989) . . . . . 8, 9

United States v. Leggett, 162 F.3d 237, 245 (3d Cir. 1998), cert. denied, 528 U.S. 868, 120 S. Ct. 167 (1999) . . . . . . . . . . . 5

United States v. Kelly, 707 F.2d 1460 (C.A.D.C.1983) . . . . . 32

United States v. Khorozian, 333 F.2d 498, 507 cert. denied, 124 S.Ct. 450 (2003) . . . . . . . . . . . . . . . . . . . . . 18, 36

United States v. Malpiedi, 62 F.3d 465, 469 (2nd Cir. 1995) . . 17

United States v. Moore, 375 F.3d 259, 263-264 (3rd Cir. 2004) . 19

United States v. Morelli, 169 F.3d 798, 810 (3d Cir. 1999), cert. denied, 528 U.S. 820, 120 S.Ct. 63 (1999) . . . . . . . . 16

United States v. Nahodil, 36 F.3d 323 (3rd Cir. 1994) . . . . . 20

United States v. Paramo, 998 F.2d 1212 (3rd Cir. 1992), cert. denied 510 U.S. 1121, 114 S. Ct. 1076 (1994) . . . . . . . . . 31

United States v. Parks, 68 F.3d 860, 866 (5th Cir. 1995) . . . 40

United States v. Perdomo, 929 F.2d 967 . . . . . . . . . . . . 24

United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir.1989), cert. denied, 493 U.S. 995, 110 S.Ct. 546 . . . . . . . . . . 31

United States v. Taylor, 17 F.3d 333, 340 (11th Cir. 1994) . . 25

United States v. Teaque, 953 F.2d 1525, 1533 (11th Cir. 1992), cert. denied, 506 U.S. 842, 113 S.Ct. 127 (1992) . . . . . . . 5

United States v. Vega, 285 F.3d 256 (3d Cir. 2002) . . . . . . 19

United States v. Young, 470 U.S. 1 (1985) . . . . . . . . . . 29

Walker v. Johnson, 312 U.S. 275, 61 S.Ct. 574 (1941) . . . . . 21

Wiggins v. Smith, 593 U.S. 510, 123 S.Ct. 2527 (2003) . . . . 9, 10

**FEDERAL STATUTES**

28 U.S.C. §2255 ("§ 2255") . . . . . . . . . . . . . . .  1,2,19, 20

USSG 2F1.1(a), 18 . . . . . . . . . . . . . . . . . . . .  35

USSG 5K.1.1 . . . . . . . . . . . . . . . . . . . . . . .  28

USSG5 K.1 . . . . . . . . . . . . . . . . . . . . . . . .  29

**FEDERAL RULES OF CRIMINAL PROCEDURE**

Rule 35 . . . . . . . . . . . . . . . . . . . . . . . . .  30

**FEDERAL RULES OF EVIDENCE**

Rule 404b . . . . . . . . . . . . . . . . . . . . . . .  18, 19

**RULES OF PROFESSIONAL CONDUCT**

R.P.C. 2.1 . . . . . . . . . . . . . . . . . . . . . . .  17

R.P.C. 1.7 . . . . . . . . . . . . . . . . . . . . . . .  17

## INTRODUCTION

The  events which underlying the instant case include denials of (a) Petitioner's Due Process rights, as guaranteed by the Fifth Amendment of the United States Constitution, (b) her right to effective assistance of counsel as guaranteed by the Sixth Amendment, (c) and Petitioner's right to Equal Protection under the law.  Petitioner submits that her sentence in the instant case should be vacated in light of these constitutional violations. As a minimal alternative, Petitioner deserves an evidentiary hearing to present these issues as well as their supporting evidence.

## JURISDICTION

Jurisdiction over this post-conviction remedy, exists under statutory framework of 28 U.S.C. §2255 ("§ 2255") which permits post-conviction relief.   The Petitioner's judgment of conviction became final on October 20, 2003 when the United States Supreme Court denied her Petition for Writ of Certiorari. Petitioner is serving her term of incarceration at FCI Danbury in Danbury, Connecticut.

## STATEMENT OF THE CASE

The procedural history of this matter  and statement of the case are presented in the attached Motion to Set Aside, Vacate, or Correct.

## ARGUMENTS OF LAW

### I.   CAUSE AND PREJUDICE

A motion to vacate, set aside, or correct sentence pursuant to §2255 must allege one of three bases for relief:

    (1)    An error of constitutional magnitude;
    (2)    A sentence imposed outside the statutory limits;
    (3)    An error of fact or law which was so fundamental as to render the entire proceedings invalid.

*United States v. Addonizio,* 442 *U.S.* 178 (1979). In Petitioner's case, errors of constitutional magnitude so fundamental were committed which included those of such a fundamental nature that the entire proceedings lacked minimally requisite due process integrity.  Petitioner can present sufficient facts to prove violations of her rights to due process.

Petitioner seeks to vacate and set aside her conviction and sentence due to errors occurring at her criminal trial and on appeal, including acute violations of the Petitioner's Fifth Amendment rights and denial of her rights to effective assistance of counsel in violation of the Sixth Amendment.

When such errors occur and actual prejudice results, §2255 provides for collateral review. *See United States v. Frady,* 456 *U.S.* 152 (1982).   To prevail in a collateral review under §2255, a party must an error and prejudice to the defendant. It is also well-established that in the absence of cause and prejudice, a claim not raised under direct review may be raised

in a § 2255 motion if the Petitioner can demonstrate that he is actually innocent of the underlying crime. *Bousley v United States*, 523 *U.S.* 614 (1998); *United States v. Garth*, 188 *F.3d* 99 (3ʳᵈ Cir. 1999). Herein, Petitioner can show error, prejudice and her underlying innocence.

## II. PETITIONER DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE UNDERLYING CRIMINAL PROCEEDINGS.

### A. COUNSEL'S IMPROPER ACTIONS EFFECTIVELY BARRED PETITIONER FROM EXERCISING HER ABSOLUTE RIGHT TO IN HER OWN DEFENSE

The Sixth Amendment to the Constitution requires that all criminal defendants receive effective legal representation. Abridgment of that right meets the "error of constitutional magnitude" standard outlined in *Addonizio*.

The Sixth Amendment requires that a Defendant receive "effective" representation. *McMann v. Richardson*, 397 *U.S.* 759, 771 n. 14 (1970). Effective representation is essential as the means through which the other "rights of the person on trial are secured." *United States v. Cronic,* 466 *U.S.* 648, 653 1984); *Strickland v. Washington*, 466 *U.S.* 668(1984).

In *Strickland v. Washington*, the Supreme Court outlined a two-prong test for identifying ineffective assistance of counsel. Counsel's performance is ineffective if it falls below an objective standard of reasonableness. The Petitioner must also show a "reasonable probability" that, but for counsel's errors, the results of the proceedings would have been

different.  *Id.* at 688, 694.  Ineffective assistance of counsel is shown where the errors are "sufficient to undermine confidence in the outcome," a standard less than "preponderance of the evidence".  *Strickland,* 466 *U.S.* at 694.

Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. *Strickland,* 466 *U.S.* at 688,  104 *S.Ct.* at 2065. *See also Powell v. Alabama,* 287 *U.S.* 45, 68-69, 53 *S.Ct.55,* at 63-64 (1932).

At trial, Angela Khorozian sought to exercise her constitutional right to testify but was effectively barred from doing so because her lawyer threatened to abandon the case if she asserted that right. (Pa 17-27).  Petitioner's efforts to find a new lawyer in the middle of the trial were unsuccessful. Terrified of being left without counsel, she felt compelled to forfeit her right to testify. Counsel refused Petitioner's direct instruction to allow her to testify. (Pa 17-27). Had she been permitted to do so, there is a reasonable likelihood the outcome of the trial would have been different.  Thus, her conviction is tainted and must be reversed.

The prosecution's case relied extensively on the questionable testimony of Eduardo Queirolo, who had been offered leniency for his own crimes if he would incriminate Petitioner. He, not Petitioner, brought the forged checks into this country and initiated the plan to deposit them in a U.S. bank. Petitioner's testimony, could have easily refuted Queirolo's,

4

thereby earning her an acquittal.

The right of an accused to testify is grounded in the Fourteenth Amendment's Due Process Clause (which includes "the right to be heard and to offer testimony," and in the Fifth Amendment. *United States v. Leggett*, 162 F.3d 237, 245 (3d Cir. 1998), *cert. denied,* 528 *U.S.* 868, 120 S. Ct. 167 (1999).

The right to testify is one of *personal choice*, to be freely exercised.  Defense counsel cannot waive or interfere with that right. *Leggett*, 162 *F.3d* at 245.[1]  By hiring a lawyer to represent her, Petitioner did not relinquish her right to make that important choice even if her attorney had other preferences. *United States v. Teague*, 953 *F.2d* 1525, 1533 (11th Cir. 1992), *cert. denied,* 506 *U.S.* 842, 113 *S.Ct.* 127 (1992). (Defense counsel cannot compel a defendant to remain silent); *Gagnon v. Scarpelli*, 411 *U.S.* 778, 93 *S.Ct.* 1756, 36 L.Ed.2d 656 (1973).

So important is this constitutional safeguard that a defense lawyer has the heavy responsibility of informing his client of this unconditional right and to ensure that she understands it. *Rega v. United States*, 263 *F.3d* 18 (2d Cir. 2001), *cert. denied,*

---

[1]  Significantly, in *Brown v. Artuz*, 124 *F.3d* 73, 78 (2d Cir. 1997), *cert. denied*, 522 *U.S.* 1128, 118 *S.Ct.* 1077 (1998), the Second Circuit ruled that "the decision whether to testify belongs to the Defendant and may not be made for him by defense counsel."  See *Jones v. Barnes*, 463 *U.S.* 745, 751, 103 *S.Ct.* 3308, 3312 (1983) (The accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal").

534 *U.S.* 1096, 122 *S.Ct.* 847 (2002).

Where a defendant insists on her constitutional right to testify, ineffectiveness of counsel cannot be excused under the doctrine of tactical decisions. [2]

A defendant can prevail on a claim of "ineffective assistance", by asserting facts which show that counsel overrode her will to make that choice.  Once that predicate is established, her conviction should be vacated.  *Ferguson v. State of Georgia*, 365 *U.S.* 570, 583, 81 *S.Ct.* 756, 763 (1961).

Here, trial counsel's acted outside the wide allowable range of professionally competent assistance when he coerced Petitioner into waiving her right to testify.  Petitioner never had the opportunity to explain what her understanding was with regard to the status of Sugarbank.  Petitioner never had the opportunity counter the testimony put forth by Queirolo regarding her understanding of the wire transfer, the hotel project, or her agreements with him.  In fact, the record was devoid of any explanation of Mrs. Khorozian's thought processes regarding this bank transaction.

Furthermore, the import of counsel's disastrous decision

---

[2]  The Constitutional recognition of this right was expressly acknowledged in *Rock v. Arkansas*, 483 *U.S.* 44, 53 n. 8, 107 *S.Ct.* 2704, 2709 n. 8 (1987), "[the] right to be heard, which is so essential to due process in an adversary system of adjudication, [can] be vindicated only by affording an opportunity to testify before the fact-finder."  In fact, an accused's right to testify is "[e]ven more fundamental than her right to self-representation."  483 *U.S.* at 51-52, 107 *S.Ct.* at 2709.

6

becomes readily apparent when an examination of the record is made.  Defense counsel was attempting to introduce a fax.  The court refused to allow its introduction commenting directly on Petitioner's failure to testify.  (7T18-23 to 19-9).[3]  Had this evidence been admitted; the jury would have known that indeed the hotel project was not a pretext conjured up by Mrs. Khorozian to avoid detection by the bank, as Queirolo asserted. It would have known that the hotel deal predated May 25, 2000, The Court of Appeals was critical of the District Court's decision but ruled that the error harmless.

The Court further refused to allow a letter that was sent by the Petitioner to the Government of Chad.  The Court would not let Ms Kono testify regarding the letter, notwithstanding the need for clarifying testimony to prove that the hotel deal was known prior to May 25th.  Since defense counsel refused to allow Petitioner to testify this important evidence was never presented.

By threatening Mrs. Khorozian and placing her in jeopardy of proceeding without a lawyer, defense counsel prevented her from presenting evidence impeaching Queirolo and denied her the exercise of her constitutional right.

---

[3] T refers to transcript dated January 23, 2002; 2T - transcript January 24, 2002; 3T - transcript January 25, 2002; 4T - transcript January 28, 2002; 5T - transcript January 29, 2002; 6T - transcript January 31, 2002; 7T - transcript February 1, 2002; 8T - transcript February 4, 2002; 9T - transcript June 26, 2002;  TP - Queirolo plea transcript.

B.   DEFENSE COUNSEL FAILED TO UNDERTAKE REASONABLE
     INVESTIGATIONS

The Constitution imposes on counsel a duty to make
reasonable investigations.  The reasonable performance of
counsel includes an adequate investigation of facts, including
interviewing witnesses, consideration of viable theories of
defense,  developing evidence to support those theories,
investigation of the true nature of the alleged conduct and the
presentation of expert testimony on the issue.  Before an
attorney can make a reasonable strategic choice against pursing
a certain line of defense, the attorney must obtain all the
necessary facts that are so essential to making these critical
decisions.  *See United States v. Gray*, 878 *F.2d* 702 (3d Cir.
1989) ("the Courts of  Appeals are in agreement that failure to
conduct any pretrial  investigation generally constitutes a
clear instance of  ineffectiveness ").[4]

"Counsel bears a duty to make a 'reasonable'
investigation of the law and facts in his client's case."
*Strickland*, 466 *U.S.* at 691.  A defendant's right to effective
assistance of counsel confers a duty on counsel to conduct an
adequate pre-trial investigation.  *McCoy v. Newsome*, 953 *F.2d*

_____

    [4]   *See also Lindstadt v. Keane*, 239 *F.3d* 191, 200 (2d Cir.
2001) (counsel "has a duty to make reasonable investigations or to
make a reasonable decision that makes particular investigations
unnecessary"); *Strickland*, 466 *U.S.* at 104 *S.Ct.* 2052 (1984).

1252, 1262 (11th Cir. 1992). "[W]hen a lawyer fails to conduct a substantial investigation into any of his client's plausible lines of defense, the lawyer has failed to render effective assistance of counsel." *Id*. at 1262-63. "Pre-trial preparation, is, perhaps, the most critical stage of a lawyer's preparation." *House v. Balkcom*, 725 *F.2d* 608, 618 (11th Cir. 1984). "Failure to investigate evidence that would be helpful to the defense is also an indication of ineffective assistance of counsel." *Id*. In *Gray, supra* at 711, the Third Circuit Court of Appeals listed factual situations which might render an attorney's representation incompetent. "Perfunctory attempts to contact witnesses not reasonable." *Sullivan v Fairman*, 819 *F.2d* 1382 at 1391-92(7th Cir. 1987). It is a defense attorney's responsibility to prepare for any key witnesses to be examined at trial. See *Aldrich v. Wainwright*, 777 *F.2d* 630  (11th Cir. 1985) Such a preparation, especially in light of the complex nature of this case, was non-existent.

As the Supreme Court recently declared in *Wiggins v. Smith,* 593 *U.S.* 510, 123 *S.Ct.* 2527 (2003), on any claim of ineffective assistance of counsel based on failure to investigate, the particular decision not to investigate must be directly assessed for reasonableness in all circumstances applying a heavy measure of deference to counsel's judgments. In assessing the reasonableness the investigation, court must consider not only

quantum of evidence   already known to counsel, but also whether
known evidence would lead reasonable attorney to investigate
further. *Id.* at 123.

Here, trial counsel's performance fell dismally below the
standards established by *Strickland*.   Counsel's failure to
undertake any investigation of Eduardo Queirolo, or of any facts
averred by the Government through the bank officials was
inexcusable.

A cursory investigation would have revealed dynamic
impeachment material relating to Queirolo's credibility
including the fact that he had outstanding criminal complaints
in Brazil.   Although Mrs. Khorozian asked defense counsel to
speak with the investigator, Mr. Feoranz, and give him some
direction, counsel never even telephoned him. (Pa 28-29).
Failure of counsel to hire an investigator to search for
evidence demonstrates that counsel was deficient. *Id.*

Numerous witnesses could have contradicted Queirolo's
testimony showing him to be a liar.    For example, Queirolo
testified the money to open the bank account at Hudson United
was <u>always</u> going to be in the form of checks and that Petitioner
knew this.   He testified that was no plan to build a hotel. Had
defense counsel properly investigated and prepared the case,
counsel would have presented evidence that on May 19, 2000,
Queirolo had made plans to travel to Chad with his "investor" to

10

finalize the deal.  The evidence would have refuted Queirolo's testimony that he and Petitioner concocted the plan on May 25th, two weeks later.

Moreover, Judge Goudja, Mr. Abdelmajid, Mr. Barma Barka, Francois Beteco and others would have refuted many areas of Queirolo's testimony.  Defense counsel's failure to investigate and prepare the witnesses resulted in the loss of this crucial corroborative testimony which would have proved Queirolo to be a liar. (Pa 15-16, Pa 17-27, Pa 30-33).(Pa 15-16, Pa 31-32).[5]

Specifically, on February 1, 2000, defense counsel readily admitted that he had not spoken "directly" with a crucial witness in the case, Judge Goudja. (8T26-12 to 13).  Moreover, without Petitioner's permission, counsel decided to forego a continuance when Goudja's wife died rendering Judge Goudja temporarily unavailable.  Counsel  could not have completely understood the import of this witness's testimony without ever having spoken with him.

In the appeal of this matter, the 3rd Circuit Court of Appeals ruled that defendant had not been denied Due Process for the failure of the Court to grant the continuance inasmuch as defense counsel had consented.  Additionally,  import of Goudja's testimony was never properly explained to the Court of

---

[5] Defense counsel refused to communicate with Mrs. Khorozian prior to trial.  Her phone calls went unanswered and she was left to speak with defense counsel's secretary. (Pa 34-37).

Appeals, which understandably could not determine the detrimental impact of counsel's failure to demand the continuance.

Instead of demanding a continuance, Defense counsel acquiesced commenting that Goudja's evidence merely duplicated Kono's. The evidence was not duplicative because the court refused to allow Kono to testify about the cost of the hotel project reasoning that Kono was not a member of the Chad government but rather, from Camaroon. In contrast, Judge Goudja, who worked for the Chad government, would have been permitted to introduce documentary evidence regarding the cost of the hotel project. Without Goudja, the defense could not counter Queirolo's testimony that there was no hotel project.

John Demetrius who testified at trial for the defense was not actually interviewed by counsel until January 27, six days after the trial began. In contrast, the FBI interviewed Demetrius four times. (Pa 38-39). During Demetrius' testimony defense counsel failed to question Demetrius regarding what he said to Petitioner regarding making Sugarbank ready for business. Had counsel done so, Demetrius' testimony would have shown that Petitioner was ignorant of what procedures were necessary.

Similarly, Stephen Houston could have testified that he had heard Queirolo speaking in English to Petitioner's husband about

12

the hotel project.[6]  He also would have testified that Quierolo shredded evidence at Petitioner's home while she was away in Florida.  (Pa 40-41).

Defense counsel never called Madeline Wasserman would have testified that she attended the April 17th dinner for the Chad officials at which there was extensive discussion about the hotel. (Pa 42-48).  He never discussed with Petitioner any reason for not calling Mrs. Wasserman.

Defense counsel (a) failed to investigate certain crucial issues regarding bank procedures and bank practices, (b) failed to obtain bank records, (c) failed to ask for the bank's operating manual, (d) failed to call witnesses to support the defendant's contention that the bank officers had acted improperly and (e) failed to call Vincent Feoranz to testify that the bank officers refused to speak with him regarding the case. (Pa 49-50).

Defense counsel also failed to subpoena videotapes bank records, maintenance records from the bank regarding the crucial dates in question. (Pa 51).  The tapes might have demonstrated that Petitioner did not introduce Queirolo as Teixeira.  Counsel failed to subpoena the bank manual regarding the rules and regulations of the bank.  He also failed to subpoena the bank's

---

[6] Queirolo testified he could not speak English.  Not only did he speak English, he did so concerning the hotel project.

telephone records which would have refuted testimony from Government witnesses that Petitioner called the bank's 800 number to see if the checks had cleared.

Defense counsel failed to subpoena Petitioner's phone records which would have corroborated that the fax of May 16th was sent from the Khorozian home.  Defense counsel failed to ask for the receipts that Mrs. Khorozian  purportedly filled out at the bank the day of her arrest. Had she truly attempted to withdraw some of the funds from the account there should have been receipts to prove this.

From the inception of the case defense counsel believed that the case would be dismissed.  He utterly failed to allow Mrs. Khorozian to participate in her defense as shown by Petitioner's letters and her certification.  (Pa 17-27, Pa 34-37).

In addition, Defense counsel failed to argue numerous key points to support Petitioner's contention that she believed Teixeira was a bonafide investor.  Counsel did not fully understand the case and was not prepared to try it.

Finally, defense counsel even failed to argue that the fine imposed was excessive.  Failure to appeal a clearly erroneous fine, in and of itself, may constitute ineffective assistance of counsel. *See Ratliff v. United States,* 999 *F.2d* 1023 (6th Cir. 1993) which addressed the issue of restitution.

Defense counsel thus denied Petitioner an adequate

14

opportunity to defend herself,  resulting in a reasonable

probability that his ineffectiveness prejudiced the outcome of

the trial.

     C.    COUNSEL'S CONFLICTS OF INTEREST IMPAIRED HIS
           DEFENSE OF PETITIONER

     Petitioner wanted to call two witnesses, Madeline

Wasserman and Shelly Wengrovsky to testify as to her reputation

for honesty in the community, her success as a business woman

and  her law abiding nature.  Unbeknownst to Petitioner,

defense counsel had previously represented Mrs. Wasserman had

knew that she had been convicted of a crime.  Counsel never

disclosed this to Mrs. Khorozian inasmuch as the information

would have been detrimental to Mrs. Wasserman's business

relationship with Mrs. Khorozian.  When Petitioner asked him to

have Mrs. Wasserman testify, counsel refused threatening to

quit if forced to call her. (Pa 42-48)

     Shelly Wengrovsky, formerly an agent with the IRS and with

ATF was aware that many years earlier, Mrs. Khorozian had

served as a whistle blower and government informant concerning

criminal activity by her employer.  Petitioner wanted Mr.

Wengrovsky as a character witness to testify that that she had

put herself at risk to aid the Government in a criminal

investigation.  (Pa 54-61). However, defense counsel refused to

call Agent Wengrovsky and offered no explanation to

Petitioner. Counsel thus concealed that he had represented the

target of that same criminal investigation.

The Third Circuit has devised a relatively simple two-step test to gauge an ineffectiveness claim based upon an actual conflict of interest:

> First, Petitioner must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. Petitioner need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative.

> Second, Petitioner must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *United States v. Morelli,* 169 *F.3d* 798, 810 (3d Cir. 1999), *cert. denied,* 528 *U.S.* 820, 120 S.Ct. 63 (1999), *citing United States v. Gambino,* 864 *F.2d* 1064, 1070 (3d Cir. 1988), *cert. denied,* 492 *U.S.* 906, 109 *S.Ct.* 3215 (1989).

Once these essentials are established, then the prejudice component, normally necessitated by *Strickland* to sustain an ineffectiveness claim, is *presumed* and need not be proven. *Morelli*, 169 *F.3d* at 810. A defendant represented by conflicted counsel may be disadvantaged in ways that will never be known and may not be apparent on the record. As the Supreme Court pointed out, the true "evil" of a conflict "is in what the advocate finds himself compelled to refrain from doing." *Holloway v. Arkansas*, 435 *U.S.* 475, 490, 98 *S.Ct.* 1173, 1182 (1978).

For this reason, *"prejudice is usually presumed"* when

16

counsel is burdened by an actual conflict. *United States v. Feyrer*, 333 *F.3d* 110, 116 (2nd Cir. 2003). A defendant has a constitutional right to an attorney "who can make strategic and tactical choices free from any conflict of interest." *United States v. Malpiedi*, 62 *F.3d* 465, 469 (2nd Cir. 1995).

It is unethical for counsel to undertake a representation where counsel's actions are restricted by his duties to prior clients. R.P.C. 2.1 provides:

> In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.

Counsel cannot be independent if he has secret undivulged allegiances to other clients. Counsel who violate this ethical standard provide assistance below the reasonably expected standard of an attorney. *RPC* 1.7

D.   DEFENDANT'S FAILURE TO OBJECT TO HIGHLY
     PREJUDICIAL STATEMENTS OF CO-DEFENDANT DENIED
     THE PETITIONER EFFECTIVE ASSISTANCE OF COUNSEL.

From the very outset of the trial Petitioner was demonized and her entire defense was destroyed by the introduction of seriously prejudicial testimony by the co-defendant, Queirolo.

Queirolo testified on direct examination that "At that moment Angela told me that she needed more money because she had to . . pay outsiders, pay off some prime minister". (2T63-8 to 14).

17

Counsel failed to object effectively labeling Petitioner as guilty of bribery.  Obviously, someone who would condone bribery would also condone bank fraud and conspiracy. Moreover, the Government failed to give notice of this testimony prior to trial; once elicited, the defense counsel should have requested a mistrial or, at the very least, a limiting instruction.  In fact, the court itself asked questions regarding the alleged bribery which did not in fact take place. (2T64-13 to 14).  The court *sua sponte* should have given a limiting instruction. Instead, the court's questions reinforced the false image of Petitioner as a criminal.

Defense counsel compounded the problem when he spent time reviewing this testimony with Queirolo, rendering any  defense useless. (3T20-3 to 10).   Even the Third Circuit Court of Appeals was influenced by this highly prejudicial testimony. Discussing Ms Kono's evidence,  the appellate court stated,

> "Queirolo testified that Khorozian intended to *bribe* an African official to corroborate the fax. Kono may have been that official". *United States v. Khorozian*, 333 F.2d 498, 507 *cert. denied*, 124 S.Ct. 450 (2003).

Rule 404 (b)of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case

> shall provide reasonable notice in advance of trial,
> or during trial if the court excuses pretrial notice
> on good cause shown, of the general nature of any
> such evidence it intends to introduce at trial.

In order for such evidence to be admissible under 404(b), "(1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its potential for unfair prejudicial effect under Rule 403; and (4) the Court must charge the jury to consider the evidence only for the limited purpose for which it is admitted." *United States v. Moore*, 375 *F.3d* 259, 263-264 (3rd Cir. 2004) *United States v. Vega*, 285 *F.3d* 256, 261 (3d Cir. 2002).

Defense counsel's failure to object or ask for a limiting instruction amply demonstrates that his representation fell well below the norm required of an advocate representing a criminal defendant. He allowed this evidence to go to the jury, who were left without any guidance on how to weigh this very prejudicial testimony. Counsel's ineffectiveness rendered Petitioner's defense virtually untenable.

E.   A HEARING IS REQUIRED TO INVESTIGATE WHETHER
     PETITIONER WAS DEPRIVED OF HER CONSTITUTIONAL RIGHT
     TO THE EFFECTIVE ASSISTANCE OF COUNSEL

Under § 2255, "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to *no* relief, the court *shall* . . . grant a prompt hearing thereon" (emphasis supplied). Rather, to obtain a hearing, a petitioner need only establish that she has a *"plausible"* ineffectiveness

19

claim.  *Armienti v. United States,* 234 *F.3d* 820, 823, (2d Cir.
2000) (emphasis supplied).  To warrant a hearing, Petitioner
does *not* have to prove that she will necessarily succeed on the
claim.  *Id.*

Recognizing the extremely low statutory threshold for
obtaining a hearing, and the significant benefits from a
properly developed record, appellate courts frequently remand
§ 2255 proceedings back to the district court for a hearing.
*See, e.g., Solis v. United States,* 252 *F.3d* 289 (3rd  Cir. 2001).
(Section  2255 "requires that a hearing precede any District
Court determination of a disputed issue of fact concerning
petitioner's entitlement for relief"); *United States v. Nahodil,*
36 *F.3d* 323 (3rd Cir. 1994) (failure to hold fact hearing is
abuse of discretion); *Armienti,* 234 *F.3d* at 822-23 (hearing
warranted regarding counsel's conflict of interest from
government's pending investigation of counsel).

Angela Khorozian has made a sufficient showing to justify
holding a hearing concerning the merits of her claims.  She has
shown that counsel utterly failed to act in her interest to
provide adequate representation. This Petition, supported by
sworn affidavits, raises very serious allegations of a
constitutional dimension.

Moreover, the decisive question of whether trial counsel was
ineffective is best addressed at a hearing where *counsel could*

*be called as a witness.* As recently recognized by the Supreme Court, the district judge would have the opportunity at a hearing to hear firsthand from trial counsel regarding the reasons, if any, for his actions or omissions. *See Massaro v. United States*, 538 *U.S.* 500, 123 *S.Ct.* 1690, 1694 (2003) To reject this Petition without taking testimony, based solely on a prosecutor's opposition, would be improper.[7]

The evidence against Angela Khorozian was far from overwhelming. The jury deliberated and debated for two days before reaching a verdict. In a close case even a single error may render counsel's performance ineffective. *See Murry v. Carrier,* 477 *U.S.* 478, 496, 106 *S.Ct.* 2639, 2649 (1986) ("the right to effective assistance of counsel ... may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial").

F. CUMULATIVE ACTS OF OMISSION AND COMMISSION

The cumulative acts of counsel, by omission and com-

---

[7] In *Walker v. Johnston*, 312 *U.S.* 275, 285, 61 *S.Ct.* 574, 579 (1941), the Supreme Court held that if an issue of fact is presented, judges shall determine the facts by hearing the testimony and arguments, not merely by relying upon affidavits submitted in opposition by the government. There, the Court stated that judicial inquiry into the "very truth and substance of the causes" of the defendant's detention "*involves the reception of testimony.*" 312 *U.S.* at 285-86, 61 *S.Ct.* At 579 (emphasis supplied). *See also Machibroda v. United States*, 368 *U.S.* 487, 494, 82 *S.Ct.* 510, 513 (1962) (district court failed to act " in conformity with the provisions of {§ 2255} when it made findings on controverted issues of fact without notice to Petitioner and without a hearing").

mission, served to burden the Petitioner with constitutionally deficient Sixth Amendment assistance.

First, counsel's omission of the defense witnesses' testimony served no strategic purpose. The omission of Vincent Feoranz and others was not a strategic judgment call but was, rather, a plain omission which presented "no advantage" to the defense.

Second, Petitioner was prejudiced by counsel's failures. She has shown (a) that counsel's failure to prepare the case properly undermined confidence in the outcome of the proceeding, and (b) that there exists a reasonable probability that had the witnesses and the Petitioner been called as witnesses, the result of the proceeding would have been different. *Strickland*. 466 *U.S.* at 694.

In *Pavel v. Hollins*, 261 *F.3d* 210 (2nd Cir. 2001), the Second Circuit Court of Appeals found defense counsel rendered ineffective assistance under circumstances highly similar to those herein. In *Pavel*, defense counsel "decided not to prepare a defense for Pavel solely because he was confident that, at the close of the prosecution's presentation of its evidence, the trial judge would grant a motion to dismiss the Government's charges against Pavel." *Id*. at 216. In regard to this, the *Pavel* panel stated that counsel "opted not to prepare a defense based entirely on this rationale militates strongly in favor of the

22

conclusion that his representation of Pavel was constitutionally deficient." Id.); *See also, Gomez v. Beto*, 462 *F.2d* 596, 597 (5th Cir. 1972).

Defense counsel operated under the false assumption that the prosecution could not and would not, at the close of its case, be able to prove the defendant's guilt beyond a reasonable doubt.[8]  Counsel believed that he would win the motion to dismiss and therefore it was not necessary to investigate.  He repeatedly told the Petitioner that she should not worry, and she relied upon him to her detriment.

Simply put, the Petitioner was burdened with ineffective assistance of counsel.

**III    THE PETITIONER'S CONVICTION WAS OBTAINED THROUGH THE   GOVERNMENT'S FAILURE TO DISCLOSE BRADY MATERIAL, AND THE USE OF COERCIVE PRACTICES**

Petitioner's conviction was obtained through the Government's failure to disclose <u>Brady</u>,[9] material, and through the Government's misconduct.

Eduardo Queirolo, the chief witness, had outstanding charges in Brazil for bank fraud and tax evasion. He was wanted in Brazil.  The Government knew this but did not disclose it to

---

[8] In his argument to dismiss, he relied upon caselaw from the 1800s that was not pertinent or controlling.

[9] 373 U.S. 83, 83 S. Ct. 1194 (1963)

defense.  (Pa 62-64).  The Petitioner had a right to cross examine Queirolo regarding what benefits he may have derived from the Government with regard to the charges or whether the Brazilian authorities were made aware that he was in *U.S.* custody.  The Governments's non-disclosure deprived her of that right.  The Petitioner also had the right to cross examine Queirolo with regard to whether the Government made any promises about turning him over to Interpol or the Brazilian authorities if Queirolo did not testify. Again the Government's non-disclosure deprived her of that right.

The Petitioner had the right to full disclosure of *all* of the promises that were made to Queirolo. The government's failure to give the defense the criminal record of a key prosecution witness has been held to be a Brady violation. *See United States v. Perdomo*, 929 *F.*2d 967 (3rd Cir. (1991).  The government's misconduct affected the trial and its outcome. Queirolo was able to testify as if he were a well respected business owner rather than someone wanted for similar crimes and convicted of similar crimes in his own country.  The Government had the ability and the duty to access his criminal record and was required to investigate. Having conducted an  exhaustive investigation into the background of defense witnesses,[10] the

---

[10] The Government was able to question a minor defense witnesses regarding a bankruptcy.  A minimal investigation would have disclosed Queirolo's record.

Government owed Petitioner the duty to investigate similarly its main witness's background.

In some cases, the government's failure to disclose a criminal record is not necessarily outcome determinative. The matter herein is not such a case. Rather, in this case, evidence of Petitioner's guilt was not overwhelming and almost the entire case rested heavily on the trustworthiness of Queirolo.

"The importance of full cross-examination into possible bias increases where, as here, the witness is the star government witness or participated in the crimes for which the defendant is being prosecuted. *United States v. Taylor*, 17 *F.3d* 333, 340 (11th Cir. 1994); *Haber v. Wainwright*, 756 *F.2d* 1520, 1522 (11th Cir. 1985); *United States v. Barrentine*, 591 *F.2d* 1069, 1081 (5th Cir.). Full cross-examination is particularly critical when the examinee is the chief government witness. *United States v. Baptista-Rodriguez*, 17 *F.3d* 1354, 1366 (11th Cir. 1994).

A crucial issue in this case was whether Petitioner had introduced Queirolo at the bank as Mr. Teixeira. To prove intent to defraud the Government offered only Mr. Moscati's testimony that Petitioner introduced Queirolo by a false name. The Government knew that Queirolo would have testified that he was <u>not</u> introduced as Teixeira which would have undermined the

case against Petitioner. [11]   The AUSA intentionally hid this
exculpatory fact from the jury and the defense.  This failure
alone would warrant a retrial.  The Government's failure to
divulge this crucial fact allowed the AUSA to argue on summation
that Petitioner intended to commit bank fraud because she
knowingly created a false impression regarding the owner of the
checks.  Queirolo's testimony  obviously would not have
supported the government's argument; so the AUSA never asked
Queirolo the pertinent question.

The Government also told the jury repeatedly that Queirolo
did not speak English.  This gave the jury the impression that
Queirolo did not understand that he was introduced as Texteira
which in turn "explained" why he did not testify regarding the
introduction. [12] (2T68-16 to 22; 3T7-2 to 7).

The Government never asked Queirolo questions regarding the
alleged "plan" that Queirolo and Mrs. Khorozian purportedly
discussed to defraud the bank and the plan to make a false
introduction.  A false introduction could not have occurred
without a prior discussion between the Queirolo and Petitioner.

The AUSA also failed to divulge to the defense that the
Hudson United Bank was under investigation for misconduct and
money laundering during the investigation of this case.  The

---

[11] Moscati testified Queirolo was introduced as Texteira.

[12] Counsel admitted Queirolo spoke English. (TP

investigation eventually led to the bank paying six million dollars in fines and penalties.  The pending investigation may have provided the motive for the bank officials to fabricate testimony. (Pa 69-86).  As a result of the government's non-disclosure of this exculpatory material the bank officials appeared to the jury as disinterested third parties.  In fact, a senior vice president for the bank was actually indicted. (Pa 87-91).

The Government also failed to turn over the videotape recordings that were made by the bank or any rough notes made by the FBI agents when the incident was reported.  The only videotape from the bank given to the Petitioner was blank.  The bank was required by law to make such recordings; they might well have shown that Queirolo was not introduced as Teixeira as the Government claimed.  (Pa 42-48, Pa 51).[13]

_____

[13]In addition, certain threats were made by FBI agents to defense in an attempt to intimidate them.  This is an abuse of process on the part of the Government.  The Government indicated to Ivan Fisher that Douglas Baker had a filed tax returns listing losses on one of Petitioner's companies.  This had absolutely no bearing on this matter and could only have been for the purpose of intimidation. (Pa 93).

According to Queirolo, in his statement to Dennis McCarthy, the defense investigator hired after the verdict, the Government knew about the pending charges and threatened to turn Queirolo over to the authorities if he did not cooperate.  Queirolo's conversation with Denis McCarthy coupled with the notes taken by Vincent Feoranz when speaking to AUSA Michele Brown leads to that conclusion. (Pa 62-69).  On September 22, 2000, Michele Brown told Feoranz that Petitioner should get a lawyer and that the Government was planning to charge Queirolo with more crimes.  (Pa 69).  The fear of more charges forced Queirolo to testify falsely against Mrs. Khorozian. (Pa 62-64; Pa 65-68).

The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. Accordingly, Withholding exculpatory materials violates the Supreme Court holding in *Brady v. Maryland*, 373 *U.S.* 83, 83 S.Ct. 1194 (1963). "Suppression by the prosecution of evidence favorable to the accused upon request violates due process." *Brady, 373 U.S.* 87. The Brady rule extends to impeachment evidence in addition to purely exculpatory evidence. *Giglio v.United States*, 405 *U.S.* 150, 153-54, 92 S. Ct. 763 (1972); *United States v. Bagley*, 473 *U.S.* 667, 676, 105 S. Ct. 3375 (1985). *See Marshall v Hendricks*, 307 *F.3d* 36, 52 (3rd Cir. 2002) *cert*. den. 507 *U.S.* 929, 113 *S. Ct.* 1306 (1963).

In *Giglio*, the prosecution had withheld a promise to a key witness that if he would cooperate he would not be charged.  The failure by the government to disclose a promise of immunity, made to a key witness, required reversal for a new trial. *Id.* at 108-09.

The prosecutor in a criminal case is the representative not of an ordinary party, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose true interest, is that justice be done. *Strickler v. Greene*, 527 *U.S.* 263, 281, 119 *S.Ct.* 1936, 1948, (1999) (citing *Berger v. United States*, 295 *U.S.* 78, 88, 55

S.Ct. 629, (1935)). Consequently, the duty to disclose such evidence is constitutionally required even in the absence of a request by the accused. *See United States v. Agurs,* 427 *U.S.* 97, 96 *S.Ct.* 2392 (1976).

A defendant's due process rights are violated when the prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright,* 477 *U.S.* 168, 181 (1986); *Smith v. Phelps,* 455 *U.S.* 209, 210 (1982). Furthermore, the overall weight of the evidence of guilt should be considered in determining the denial of due process. *United States v. Young,* 470 *U.S.* 1, 19 (1985). Whether the misconduct relates to a critical part of the case is also considered in determining denial of a fair trial. *Giglio,* 405 *U.S.* at 154 (1972). In *Kyles v. Whitley,* 514 *U.S.* 419,   115 *S.Ct.* 1555 (1995), the Supreme Court opined that  'that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Id.*  Herein, the Government's failure to turn over the Brady material constitutes prosecutorial misconduct, a violation of the Petitioner's rights to due process and a fair trial.

The Court in *United States v. Bagley,* 473 *U.S.* 667 (1985), disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.  Regardless of the request,

favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, *supra* at 433.

"*Bagley's* touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important." *Id.* at 506.  [Bagley] "is not a sufficiency of the evidence test. [Rather, it requires merely a ] "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

"[O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Id.* at 435.  To determine materiality of withheld evidence , the  evidence is "considered collectively, not item-by-item." *Id.* at 436        A "prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id.* at 439

Finally, Petitioner has asked the Government to submit a USSG 5K.1.1 letter in accordance with Rule 35. (Pa 94-102). Petitioner seeks a further downward departure to her sentence.

On June 5, 2000, defendant was arrested at the bank. Queirolo had fled New Jersey and was heading home to Brazil. The FBI agents had no idea who he was or what his participation had

been in the alleged bank fraud.  The defendant gave the FBI agents Queirolo's name, the airline that he was flying on and the scheduled time of departure.  At the request of Petitioner, Mr. Khorozian set out with the FBI to attempt to capture him.

Without the help of the Petitioner, Queirolo would have left the country and would not have been apprehended.  Moreover, no one would have known that Queirolo was not Teixeira.

In *United States v. Paramo*, 998 *F.2d* 1212 (3rd Cir.1992),*cert.* denied 510 *U.S.* 1121, 114 S. Ct. 1076 (1994), the Third Circuit ruled that the Government may not refuse to write a USSG5.K.1 letter requesting a downward departure from the Federal Sentencing Guidelines because a defendant has exercised his right to have a jury determine his charges.  "A defendant may not be penalized for exercising his constitutional right to trial.  *Id.*

To succeed on a *Paramo* claim Petitoner must prove vindictiveness.  *Id.* at 1220  *citing United States v. Schoolcraft,* 879 *F.2d* 64, 68 (3d Cir.1989), *cert.* denied, 493 *U.S.* 995, 110 *S.Ct.* 546 1989).  *See United States v. Goodwin, 457 U.S. 368,* 374, 102 *S.Ct.* 2485, 2489. *U.S. v. Paramo*, 998 *F.2d* at 1220.

In this case, the Co-defendant arranged for the financing, brought the checks into the country, failed to declare their worth at customs, and received encripted messages meant to confuse the Petitioner.  The Petitioner, on the other hand, gave

31

numerous proffers, had helped the Government in the past, and played a major role in capturing the Co-defendant.  There  is no explanation for not giving a downward adjustment to the guidelines.  The only reasonable explanation is that the Government is being retaliatory for her asserting her right to be tried by a jury.

**IV.   THE PETITIONER'S CONVICTION WAS OBTAINED THROUGH THE GOVERNMENT'S KNOWING USE OF PERJURED TESTIMONY.**

The  Petitioner's conviction was obtained through the Government's knowing use of perjured testimony.  Implicit in the concept of ordered liberty is the principle that the government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction.  *Napue v. Illinois,* 360 *U.S.* 264, 269 (1959).

In light of <u>Napue</u> and its progeny, courts throughout the nation have held that a Fifth Amendment violation of general due process can be the basis to overturn a conviction, but it should be applied only in those instances where the conduct of the government reaches a demonstrable level of outrageousness. *United States v. Kelly*, 707 *F.*2d 1460 (C.A.D.C.1983); *also, See Dowling v. United States,*493 *U.S.* 342, 352, 110 *S.Ct.* 668(1990).

The test to determine if due process has been met is whether, under the circumstances, the accused received a fair trial.  *United States v. Baca*, 687 *F.*2d 1356 (10th Cir. 1982).

Thus, when determining whether an error at the trial court violated due process, the Court must make a determination that evidence in the case was "so prejudicial in the context of the proceedings as a whole that [the defendant] was deprived of the fundamental fairness essential to the concept of due process." *Scrivner v. Tansy*, 68 *F.*3d 1234, 1239-40 (10th Cir. 1995) *cert.* denied, 516 *U.S.* 1178 (1996). Such factors include knowingly using perjured testimony.

The Government knowingly used false testimony and failed to correct false testimony from its witnesses. The key question then is whether Petitioner's due process rights were violated because of this knowing use of perjured testimony. The answer to the question is yes.

The standard for addressing perjured testimony which leads to a conviction is clear and quite representative of the goals of the Fifth Amendment to the U.S. Constitution. "The dignity of the United States Government will not permit the conviction of any person on tainted testimony." *Mesareosh v. United States*, 352 *U.S.* 1, 77 *S. Ct.* 1 (1956). In no clearer terms, a criminal defendant is denied due process when perjured testimony is knowingly used at trial or if known untrue testimony goes uncorrected. *Goodwin v. Johnson*, 132 *F.*3d 162 (5th Cir. 1997). A verdict based upon the government's use of perjured testimony must be set aside if "there is any reasonable likelihood that

33

the false testimony could have affected the judgment of the jury." *United States v. Agurs, supra* at 103 relied upon in *Robinson v. Arvonio,* 27 *F.*3d 877 (3rd Cir. 1994), *cert.* granted, Judm't vacated 513 *U.S.* 1186, 115 *S.Ct.* 1247 (1995).

The existence of false testimony violates the Fifth Amendment. The prejudice to the Petitioner where such testimony materially impacted the jury's deliberations is quite obvious. And, the knowing use of such false testimony by the Government substantially affected due process rights.

Petitioner contends that almost the entirety of Queirolo's testimony was the product of falsehood and fabrication and that the Government knew this.  Queirolo testified that he did not know the people who were involved in the checks.  He testified that he did not know Teixeira the original maker of the check. He also testified that he did not know the other people personally, that he just knew them by name. (2T55-11 to 13; 2T55-22 to 25; 2T56-3 to 7; 3T53-16).  However, it is obvious from the FBI's investigation and interview of Anita Cerveira that his testimony was false.

Anita Cerveira is the niece of Queirolo (Pa 103-104). Anita Cerveira worked him. (2T76-19 to 20; 2T76-25 to 77-1; Pa 27). John Khorozian led the FBI to Ms Cerveira when she visited him in jail. (Pa 42-48).

One learns from the FBI interview of Cerveira, that Queirolo knew much more about the transaction surrounding the checks than

he stated at trial. From the FBI's interview with Cerveira it is obvious that Queirolo was far more involved with the transaction than he testified Since Ms Cerveira knew the Brazilian participants, Queirolo must have known them, as well.

In addition, the Government had copies of the request to travel that was sent from Queirolo's office on May 15, 2002 to the officials in Chad. Yet, it allowed Queirolo to create a false impression that he knew nothing about the hotel project and that the proposal to finance building of the hotel in Chad was fraudulent.

The mere fact that this witness lied is detrimental enough to the Petitioner's due process rights. Coupled with the existence of perjury is whether the statements materially impacted the jury's verdict. A conviction must be reversed and not allowed to stand if it is obtained through the use of false testimony. *Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996).

### V. PETITIONER IS ENTITLED TO A NEW TRIAL IN ACCORDANCE WITH <u>BLAKELY V. WASHINGTON</u>

In <u>Blakely v. Washington</u>,-<u>U.S</u>. -, 124 S.Ct. 2531 (2004), the Supreme Court of the United States ruled that where a prisoner's sentence is increased by judicial fact finding rather than jury fact finding the increased sentence violates the trial by jury requirement of the Sixth Amendment.

It is clear that the Petitioner raised the issue in the Third Circuit Court of Appeals. *Khorozian, supra* at 509. The

Court of Appeals ruled that it was permissible for the District Court to find that Khorozian's intended loss to the bank was in fact the $20 million.  This fact was never submitted to the jury and Petitioner submits is not supported by the evidence adduced at trial.

In *Blakely*, *supra*, the Supreme Court struck down the enhancement of a defendant's sentence which had been increased due to the court finding that the crime for which the defendant was charged was done in a particularly cruel or heinous manner.

In <u>Blakely</u>, <u>supra</u>,  the Supreme Court relied on *Apprendi v. New Jersey*, 530 *U.S.* 466, 120 *S.Ct.* 2348 (2000) to reach its conclusions.  Although *Apprendi* has not been held to be retroactive, Petitioner argues that *Blakely* is applicable and must be applied retroactively.

In *Tyler v. Cain* 533 *U.S.* 656 (2001) the United States Supreme Court held that a new rule of criminal procedure may be made retroactive over the course of cases.  Since *Apprendi* was decided cases make it clear that *Apprendi* must now be considered to be retroactive and therefore *Blakely* must be retroactive as well.

In *Teague v. Lane*, 489 *U.S.* 288 (1989), the court held that new procedural rules would not be applied retroactively to cases on collateral review.  See also *Penry v. Lynaugh*, 492 *U.S.* 302, 109 *S.Ct.* 2934 (1989) which holds that the *Teague* decision has

been adopted by a majority of the courts.

One exception requires that a new rule be applied retroactively for those procedures that are implicit in the concept of ordered liberty. *Teague*, 489, *U.S.* at 311.  Such rules vindicate two distinct concerns: the fundamental fairness of the underlying proceeding; and the accuracy of that underlying criminal proceeding.  *Saffle v. Parks*, 494 *U.S.* 484, 495, 110 *S.Ct.* 1257, 1264 (1990).

In *Shiro v. Summerline*, -U.S.-, 124 *S.Ct.* 2519 (2004), the Supreme Court held that the decision in *Ring v. Arizona*, 536 *U.S.* 610 (2002) applying *Apprendi* to Arizona's capital sentencing scheme does not apply retroactively under *Teague*. The Court held that the rule at issue was fundamental. *Id* at 3. *Shiriro* at 252-55.  The majority of the justices  concluded that judicial fact-finding under a reasonable doubt standard was not shown to seriously diminish the accuracy of sentencing. Id. at 2525.  That conclusion, Petitioner submits, is  because Arizona law already required aggravating factors to be proved beyond a reasonable doubt.

Because the rule at issue here allowed judicial fact-finding under the diluted preponderance of the evidence standard, *Shiriro's* ultimate conclusion that accuracy is not seriously diminished where a judge makes findings beyond a reasonable doubt is inapposite.

The requirement of proof beyond a reasonable doubt is central to protecting the rights of the accused and the accuracy of criminal convictions. *See Cage v. Louisiana*, 498 *U.S.* 39,40 111 *S.Ct.* 328 (1990) *In re Winship*, 397 *U.S.* 358, 363,364 (1970). *Winship*, *supra* at 363. ... It is a prime instrument for reducing the risk of convictions resting on factual error. *Cage*, *supra* at 498 *U.S.* 39, 40.

"Due Process commands that no man shall lose his liberty unless the Government has borne the burden of ... convincing the fact-finder of his guilt.  To this end the reasonable doubt standard is indispensable, for it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." Id. at 364. *See* also *Ivan v. City of New York*, 407 *U.S.* 205, 92 *S.Ct.* 1951 (1972).

In accordance with the Sentencing Guidelines, Petitioner's Offense Level was a six.  USSG 2F1.1(a), 18 U.S.C.A. However, due to the amount of monies alleged that the Petitioner had attempted to take, the level was elevated to Offense Level 22.

The raising of the base level from 6 to 22 violates the dictates of *Blakely* because there was no finding by the jury that Petitioner actually intended to defraud the bank of $20,000,000.  The jury might well have convicted Petitioner of bank fraud for a myriad of other reasons such as opening the account in the name of a defunct corporation.  Therefore the escalation of the offense which began at Offense Level 1 to

38

Offense Level 22 was unwarranted in accord with Blakely. [14]

The elevation of the crime 22 Offense levels without a finding by a jury that intended that the bank lose this amount violates Petitioners constitutional right to a trial by jury and Petitioner must be immediately resentenced.

**VI.   PETITIONER IS ENTITLED TO A VACATION OF HER SENTENCE AS SHE IS ACTUALLY INNOCENT.**

The Petitioner is actually innocent.  To be sure, far too many defendants make such claims, both prior to  adjudication and while incarcerated.  However, the present case is one of those rare examples of an innocent individual being found guilty by association and without any independent evidence elicited at trial.  To be sure, the Petitioner went to the bank and opened an account in the name of Sugarbank Corporation which was defunct.  However, she had given John Demetrius the authority to

--------

[14] The jury was specifically told that it did not have to find that Petitioner intended for the bank to lose any money.  In the Court's charge, the jury was instructed that there did not need to be a finding that defendant intended for the bank to lose money.  (Pa 105).  The Court instructed the jury that it was not necessary for the defendant to believe that everyone would lose money.

Queirolo admitted that he did not realize that the checks were counterfeit.  Queirolo testified that neither he nor Petitioner believed that the bank would lose money.  Queirolo himself never testified that he intended to defraud the bank other than using funds that were the result of tax evasion.  Queirolo testified that he had checked out whether the checks were bona fide and had believed that they were and had communicated this to Petitioner.  Finally, the bank managers, themselves, had at first done a computer check of the veracity of the checks and that they had been found to  be bona fide. If the bank, itself, at first believed that the checks were valid, how could Petitioner be expected to believe anything differently?

reinstate the Corporation and did not realize that more had to be done. Furthermore, it is not a criminal act to violate a banking provision. Evidence of violations of civil banking regulations cannot be used to establish criminal conduct. *United States v. Christo*, 614 *F*.2d 486, 492 (5th Cir. 1980), *U.S. v. Parks*, 68 *F*.3d 860, 866 (5th Cir. 1995).

Petitioner did not introduce Queirolo as Teixeira. There was no evidence to show that Queirolo and Petitoner had any meeting of the minds to defraud the bank. Petitioner was convicted because she was indicted with another who lied to the Government so that he could be released from prison. The Petitioner is not guilty because she did not commit any crime and no evidence that she did was ever presented to the jury.

## CONCLUSION

**WHEREFORE**, in consideration of the foregoing, the Petitioner prays this Court to issue an order vacating the conviction and sentence previously imposed due to the errors of constitutional magnitude outlined herein. In the alternative, Petitioner requests an evidentiary hearing at which time evidence further supporting the abridgment of his constitutional protections may be submitted to this Court.

Respectfully submitted,

EDWARD J. BILINKAS, ESQ.

40

**LAW OFFICES**
# EDWARD J. BILINKAS, ESQ.
## A Professional Corporation
415 ROUTE 10 EAST
RANDOLPH, NEW JERSEY 07869

(973) 361-1212
FAX (973) 361-1241

EDWARD J. BILINKAS*†

HENRY P. APRYASZ†
SARA SENCER McARDLE*

*Certified Criminal Trial Attorney
†Member NJ and NY Bar

November 23, 2004

Clerk
United States District Court
U.S. Post Office & Courthouse
Newark, NJ 07102

    Re: **United States vs. Angela Khorozian**
        **Criminal No. 00-393 (WHW)** *CV. 04-4879*

Dear Sir/Madam:

    Enclosed herewith for filing please find the amended Brief in the above captioned matter. The Habeus Corpus Motion and appendix to this have been previously filed.

    By copy of this letter I am serving the aforementioned upon Michele Brown, Assistant United States Attorney, 970 Broad Street, Newark, New Jersey 07102; along with a copy of this Brief to the Honorable Willaim H. Walls, United States District Judge.

    Thank you for your consideration.

Very truly yours,

EDWARD J. BILINKAS

cc:     Honorable William H. Walls, U.S.D.J.
        Michelle Brown, Assistant United States Attorney